HDM:JPL/MRG
F. #2023R00698

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

CHRISTIAN JULIAN CAZARIN MEZA,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. 23-419 (ENV)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

THE UNITED STATES CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.     The Defendant and Relevant Entities and Individuals

    A.     The Defendant and His Shell Companies and Related Individuals

        1.     The defendant CHRISTIAN JULIAN CAZARIN MEZA was a citizen of Mexico and a resident of Houston, Texas. CAZARIN was the owner of construction companies with offices in the United States and Mexico. CAZARIN was a "domestic concern," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1).

        2.     Shell Company #1, Shell Company #2, Shell Company #3, Shell Company #4 and Shell Company #5 (together, the "Shell Companies"), entities the identities of which are known to the United States, were shell or front companies formed in Mexico used by

the defendant CHRISTIAN JULIAN CAZARIN MEZA to receive, conceal and distribute corrupt payments from and on behalf of Vitol Inc. for the benefit of Mexican officials.

3. Individual #1, an individual whose identity is known to the United States, was a citizen and resident of Mexico, and an employee and relative of the defendant CHRISTIAN JULIAN CAZARIN MEZA.

4. Individual #2, an individual whose identity is known to the United States, was a citizen and resident of Mexico who controlled several shell companies and bank accounts used to receive, conceal and distribute corrupt payments.

B. Vitol and Related Entities and Individuals

5. Vitol Inc. ("Vitol") was a United States company with its principal place of business in Harris County, Texas. Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(l)(B). Vitol was beneficially owned by Vitol Holding BV, a company based in the Netherlands. These companies, together with their affiliates, including Switzerland-based Vitol S.A. (collectively, the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

6. Javier Aguilar was a citizen of Mexico and a resident of Houston, Texas. Aguilar was an oil and commodities trader at Vitol Inc. Aguilar was a "domestic concern" and an "employee" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(l).

7. Co-Conspirator #1, an individual whose identity is known to the United States, was a citizen of Switzerland and Spain, and an employee of Vitol S.A.

2

C.   PEMEX, PPI and Government Officials

8.   Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX and its wholly-owned subsidiaries were wholly-owned and controlled by the government of Mexico and performed functions that Mexico treated as its own. PEMEX and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and PEMEX's and its wholly-owned subsidiaries' officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9.   PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of PEMEX headquartered in the United States that handled the acquisition of goods and services on behalf of PEMEX. PPI was an "instrumentality" of a foreign government, and PPI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

10.   Gonzalo Guzman Manzanilla was a citizen of Mexico and a resident of Houston, Texas. Guzman worked at PPI in or about and between 1999 and 2020. In or about and between 2016 and 2020, Guzman was a procurement manager at PPI. In addition, at all relevant times, Guzman acted in an official capacity for and on behalf of PEMEX. Guzman was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

11.   Carlos Espinosa Barba was a citizen of Mexico and a resident of Houston, Texas. Espinosa worked at PPI in or about and between 2006 and 2019. In or about and between 2017 and 2019, Espinosa was a procurement manager at PPI. In addition, at all relevant times, Espinosa acted in an official capacity for and on behalf of PEMEX. Espinosa was a

3

"foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

D. <u>Other Intermediaries and Shell Companies</u>

12. Lionel Hanst was a citizen of the Netherlands and a resident of Curaçao who owned and maintained several shell companies and bank accounts used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

13. Lion-Oil B.V. ("Lion Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst. Lion Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

14. Zanza Oil B.V. ("Zanza Oil") was a shell company formed in or about November 2014 in Curaçao by Lionel Hanst. Zanza Oil was used to receive, conceal and distribute corrupt payments from and on behalf of Vitol for the benefit of Mexican officials, among others.

II. <u>The Foreign Corrupt Practices Act</u>

15. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

III. The Bribery and Money Laundering Scheme

A. Overview

16. In or about and between August 2017 and July 2020, the defendant CHRISTIAN JULIAN CAZARIN MEZA, together with others, engaged in an international bribery and money laundering scheme in which he knowingly, willfully and corruptly offered and paid, and agreed to offer and pay, bribes to and for the benefit of Mexican officials in order to obtain and retain business for Vitol with and related to PEMEX and PPI.

17. To promote the bribery scheme and to conceal the proceeds derived from the scheme, the defendant CHRISTIAN JULIAN CAZARIN MEZA and his co-conspirators, including Javier Aguilar and Co-Conspirator #1, caused wire transfers of bribes and other corrupt payments to be sent to numerous domestic and offshore bank accounts through a network of shell companies and intermediaries. Many of the wires were sent to bank accounts in the United States or processed through United States-based correspondent banks.

18. To further promote the bribery scheme and to conceal the proceeds derived from it, the defendant CHRISTIAN JULIAN CAZARIN MEZA and his co-conspirators, including Javier Aguilar, created and caused the creation of sham consulting agreements and invoices, communicated about the corrupt payments through the use of alias and nonbusiness email accounts and encrypted messaging platforms, and used code names and code words to describe co-conspirators and to refer to corrupt funds used in furtherance of and derived from the scheme.

B.  The Mexico Bribery Scheme

19. Beginning in or about August 2017, the defendant CHRISTIAN JULIAN CAZARIN MEZA and Javier Aguilar, together with others, engaged in a bribery and money laundering scheme involving the payment of bribes to Mexican officials, including Gonzalo Guzman Manzanilla and Carlos Espinosa Barba, in exchange for, among other things, securing improper advantages for Vitol in obtaining and retaining business with PEMEX and PPI.

20. In or about August 2017, Javier Aguilar was introduced to Gonzalo Guzman Manzanilla, then a procurement manager at PPI, by a Vitol Group employee and mutual acquaintance. Shortly thereafter, Aguilar met with Guzman and Carlos Espinosa Barba, also a procurement manager at PPI, in Houston, Texas. At that meeting, and at subsequent meetings that took place in Houston, Texas in or about and between September 2017 and April 2018, Aguilar agreed to pay bribes to Guzman and Espinosa for confidential, inside information to assist Vitol in winning business from PPI, including a contract to supply ethane to PEMEX through PPI (the "Ethane Supply Contract"). In particular, Aguilar agreed to make payments to Guzman and Espinosa totaling approximately $600,000 if Vitol ultimately won the Ethane Supply Contract.

21. In or around September 2017, the defendant CHRISTIAN JULIAN CAZARIN MEZA met with Gonzalo Guzman Manzanilla and Carlos Espinosa Barba near PPI's offices in Houston. Guzman and Espinosa asked CAZARIN for help receiving payments in Mexico from Aguilar. CAZARIN agreed to help find companies in Mexico that could receive the payments. At subsequent meetings with Guzman and Espinosa, CAZARIN learned from Guzman and Espinosa that Aguilar worked for Vitol and that the payments were bribes in

6

exchange for Guzman's and Espinosa's assistance to Aguilar and Vitol in securing a contract with PEMEX and PPI.

22. In or around September 2017, the defendant CHRISTIAN JULIAN CAZARIN MEZA, together with Individual #1 and Individual #2, arranged to receive payments from Javier Aguilar. CAZARIN also asked Individual #1 to contact Aguilar to provide him the relevant bank account information.

23. To promote the bribery scheme and to conceal the proceeds derived from it, Javier Aguilar and his co-conspirators caused the bribes offered and promised to Gonzalo Guzman Manzanilla and Carlos Espinosa Barba to be paid through a series of transactions. Aguilar first caused the wire transfers to be sent from Vitol S.A. bank accounts in the United Kingdom to bank accounts in the names of Lion Oil and Zanza Oil in Curaçao that were controlled by Lionel Hanst. Then, at the instruction of Aguilar, Hanst made payments from Lion Oil and Zanza Oil bank accounts in Curaçao to bank accounts in Mexico in the names of several of the Shell Companies used by the defendant CHRISTIAN JULIAN CAZARIN MEZA. Finally, CAZARIN and Individual #1 caused payments to be made from, to and through several of the Shell Companies accounts in Mexico, to bank accounts in the United States and Mexico controlled by and for the benefit of Guzman and Espinosa. Some of the payments were also delivered to Guzman in cash by CAZARIN or others acting on his behalf in the United States and in Mexico. CAZARIN and others acting on his behalf also made several payments to Guzman's relatives in Mexico in cash or to their bank accounts.

24.     Javier Aguilar communicated with Individual #1, Individual #2 and others using the email address "perezmarcos007@gmail.com" (the "First Aguilar 007 Account"), instead of Aguilar's official Vitol email address.

25.     To further facilitate and disguise the payment of bribes, the defendant CHRISTIAN JULIAN CAZARIN MEZA and his co-conspirators, including Javier Aguilar, Lionel Hanst, Individual #1 and Individual #2, also created, executed and caused to be created and executed sham service agreements between one or more of the Shell Companies used or controlled by CAZARIN, and both Lion Oil and Zanza Oil, controlled by Lionel Hanst, as well as between one or more of the Shell Companies and Gonzalo Guzman Manzanilla and a relative of Guzman's.

26.     To further promote the bribery scheme and conceal the proceeds derived from it, the defendant CHRISTIAN JULIAN CAZARIN MEZA and his co-conspirators, including Javier Aguilar, Individual #1 and Individual #2, caused sham invoices to be created from several of the Shell Companies and issued to Lion Oil and Zanza Oil.

27.     The defendant CHRISTIAN JULIAN CAZARIN MEZA caused the sham invoices to be sent to Javier Aguilar at the First Aguilar 007 Account, who, via the First Aguilar 007 Account, forwarded them to Lionel Hanst, and directed Hanst to make the payments into bank accounts in the names of several of the Shell Companies. At times, Aguilar copied Co-Conspirator #1, who, like Aguilar, used an alias and non-business email address. Hanst then wired money pursuant to the sham invoices into the Shell Company bank accounts Aguilar had provided to Hanst.

28. After Lionel Hanst sent the funds, the defendant CHRISTIAN JULIAN CAZARIN MEZA typically alerted Gonzalo Guzman Manzanilla and/or Carlos Espinosa Barba that the money had arrived, referring to the bribes in Spanish as "shoes," "medicine," "invitations," "coffee," "prescriptions" and other code words meant to obscure the nature of the illicit payments. As agreed by Guzman, Espinosa and CAZARIN, CAZARIN typically retained a percentage of the money Hanst wired to the Shell Companies and, through Individual #1 and Individual #2, directed the Shell Companies to wire the rest of the money to bank accounts controlled by or for the benefit of Guzman and Espinosa, respectively, or delivered payments in cash.

29. In or about and between October 2017 and January 2020, the defendant CHRISTIAN JULIAN CAZARIN MEZA, together with others, facilitated at least seven bribe payments from Javier Aguilar totaling approximately $371,466 to be paid to or for the benefit of Gonzalo Guzman Manzanilla.

30. In or about and between October 2017 and September 2019, the defendant CHRISTIAN JULIAN CAZARIN MEZA, together with others, facilitated at least eight bribe payments from Javier Aguilar totaling approximately $255,895 to be paid to or for the benefit of Carlos Espinosa Barba.

CONSPIRACY TO VIOLATE THE FOREIGN CORRUPT PRACTICES ACT

31. Paragraphs one through 30 are realleged and incorporated as if fully set forth in this paragraph.

32. In or about and between 2017 and July 10, 2020, both dates being approximate and inclusive, within the Southern District of Texas, the defendant CHRISTIAN

JULIAN CAZARIN MEZA, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit: being a domestic concern, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Javier Aguilar, Vitol and others in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2.

33. In furtherance of the conspiracy and to effect its objects, within the Southern District of Texas, the defendant CHRISTIAN JULIAN CAZARIN MEZA, together with others, committed and caused the commission of, among others, the following:

## OVERT ACTS

(a) On or about October 12, 2017, CAZARIN and others caused approximately $32,278 to be wired from a bank account in Mexico in the name of Shell Company #1 to a bank account controlled by Espinosa in the Southern District of Texas.

(b) On or about December 19, 2017, CAZARIN sent text messages to Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "I don't know if you are waiting for me with some of the medicine or I send it another way as you see fit[.] They are 416 Mexicans[.] Around 21 gringos at the party[.]"

(c) On or about February 23, 2018, CAZARIN sent a text message to AGUILAR, via the encrypted messaging platform WhatsApp, asking him, in Spanish, "Will you have the payment receipt they are requesting it from me." AGUILAR responded, "I'll send it next week."

(d) On or about March 16, 2018, CAZARIN and others caused approximately $42,695 to be wired from a bank account in Mexico in the name of Shell Company #3 to a United States bank account controlled by and for the benefit of Guzman.

(e) On or about June 15, 2018, CAZARIN received a text message from Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "could you see if it could be brought even if it's about 5 pairs of shoes?"

(f) On or about July 11, 2018, CAZARIN sent a text message to Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "A prescription has already been sent according to him will be supplied within the next few days."

(g) On or about July 16, 2018, CAZARIN sent text messages to Guzman, via the encrypted messaging platform WhatsApp, stating, in Spanish and in relevant part, "The first prescription is ready[.] It will be available after 4 pm today."

(h) On or about July 19, 2018, CAZARIN and others caused approximately 741,000 Mexican Pesos (approximately $38,787) to be transferred from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

(i) On or about July 19, 2018, CAZARIN and others caused approximately $37,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account controlled by and for the benefit of Espinosa in the United States.

(j) On or about October 18, 2019, CAZARIN sent Guzman a document, via the encrypted messaging platform WhatsApp, with the header, in Spanish, "G.1050 invitations." Beneath the header it stated, in Spanish:

> 300 mexicans sent mty Mexico
> 100 mexico tab
> 100 mexico tab
> 50 mexico tab
>
> Total 550 already distributed in Mexico.
>
> 3 July
> 5 Sept.
> 3.5 May
> 5 Oct.
>
> Total 16.5 distributed in Texas

In text messages that followed, CAZARIN stated, in Spanish, "This is how we are going distributing [sic] invitations to the public[.] Check it please."

12

(k)     On or about October 30, 2018, CAZARIN and others caused a transfer in the amount of approximately 900,000 Mexican Pesos (approximately $44,905) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

(l)     On or about October 31, 2018, CAZARIN and others caused a transfer in the amount of approximately 642,333 Mexican Pesos (approximately $31,508) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

(m)     On or about October 31, 2018, CAZARIN and others caused a transfer in the amount of approximately 875,647 Mexican Pesos (approximately $42,953) from a bank account in Mexico in the name of Shell Company #4 to a bank account in Mexico in the name of Shell Company #2.

(n)     On or about October 31, 2018, CAZARIN and others caused approximately $36,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by and for the benefit of Guzman.

(o)     On or about October 31, 2018, CAZARIN and others caused approximately $40,000 to be wired from a bank account in Mexico in the name of Shell Company #2 to a bank account in the United States controlled by and for the benefit of Espinosa.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

34.     The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with

Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

*By Carolyn Pokorny, Assistant U.S. Attorney*

BREON PEACE
United States Attorney
Eastern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice

MARGARET A. MOESER
Acting Chief, Money Laundering and Asset
  Recovery Section
Criminal Division, U.S. Dept. of Justice